**Joan Rance VUYANICH and
Elizabeth J. King**

v.

**REPUBLIC NATIONAL BANK
OF DALLAS.**

**Ellen JOHNSON**

v.

**REPUBLIC NATIONAL BANK OF
DALLAS. (Consolidated Cases).**

Civ. A. Nos. CA–3–6982–G,
CA–3–74–7949–G.

United States District Court,
N. D. Texas,
Dallas Division.

April 25, 1979.

Joann Peters, Dallas, Tex., for plaintiff, Joan Rance Vuyanich and intervenors, Elizabeth J. King, Dorothy Hooks, Marjorie Jackson.

Linda N. Coffee, Palmer, Palmer & Coffee, Dallas, Tex., for Ellen Johnson.

Richard L. Arnold, Tobolowsky & Schlinger, Dallas, Tex., for intervenor Marisu Fenton.

Wayne S. Bishop, Donald W. Anderson, and Thomas P. Gies, Seyfarth, Shaw, Fairweather & Geraldson, Chicago, Ill., Dennis M. Race, Charles L. Warren, and John J. Gallagher, Akin, Gump, Hauer & Feld, Washington, D. C., for defendant, Republic Nat. Bank.

## MEMORANDUM OPINION AND ORDER

### I.

PATRICK E. HIGGINBOTHAM, District Judge.

Plaintiff Joan Rance Vuyanich filed this suit on March 22, 1973, alleging Republic

National Bank discriminated against her on the basis of race and sex. On November 7, 1974, Judge Mahon certified a broad class of women and blacks. Ellen Johnson filed her suit against the defendant on December 3, 1973. After a two-day evidentiary hearing, this court consolidated the Vuyanich and Johnson cases and on March 15, 1978, redefined the class as follows: all females of all races and all blacks of either sex (1) who are or have been employed by the Republic National Bank on or after February 16, 1969, or (2) who applied for employment but were not hired at the Republic National Bank on or after February 16, 1969, to date. The court then set a program for further pretrial events that contemplated further review of the class certification after substantial discovery.

At the anticipated time, the Bank moved to decertify the class or, alternatively, to redefine it more narrowly. Plaintiffs oppose the decertification or redefinition and have proposed the intervention of six additional class members.[1] This opinion and order will address both the Bank's motion and the proposed interventions.

## II. STANDING

The Bank contends that Article III of the United States Constitution mandates a redefinition of this class. It argues that a class representative only has standing to raise those class claims that she would be able to assert individually. In other words, it submits that the class device cannot extend the court's jurisdiction to claims of class members unless the named plaintiff has standing to assert those very claims. Defendant's contention is unsound for it is too broad. The Bank's premises are bottomed on a confusion of the requirements of Article III with those of Rule 23.

■ Article III, Section 2 of the Constitution, both grants and limits judicial power. It provides:

The Judicial Power shall extend to all Cases, in Law and Equity, arising under this Constitution [and] the Laws of the United States . . . ; to Controversies . . . .

Inhering in "cases" and "controversies" are dual and complementary limitations which go to the very heart of our constitutional form of government. *Flast v. Cohen*, 392 U.S. 83, 94, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968). Those words limit the judiciary to consideration of questions "presented in an adversary context and in a form historically viewed as capable of resolution through the judicial process." They also ensure that the courts will not trespass into areas reserved for the legislative and executive branches of government. *Id.* at 95, 88 S.Ct. at 1950.

■ Standing, one of several aspects of justiciability,[2] focuses on the party bringing the suit. *Id.* Under Article III, that party must "allege[ ] such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues . . . ." *Baker v. Carr*, 369 U.S. 186, 204, 82 S.Ct. 691, 703, 7 L.Ed.2d 663 (1962). Absent that injury in fact, the court lacks the power to entertain the suit.

■ At least one entity before the court must satisfy this injury in fact requirement. The only entity before the court at the inception of a class action is the class representative. Thus the court's threshold inquiry must be whether the named plaintiff alleges a sufficiently personal stake in the litigation's outcome to permit his invocation of the court's power. If he does not assert that he as an individual suffered a concrete injury, then the court's inquiry must cease. In *O'Shea v. Littleton*, 414 U.S. 488, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974), the class representative complained that the defendants engaged in a continuing course of conduct

---

1. Portia Williams, Dorothy Hooks, Martha Davis, Elizabeth King, Marisu Fenton, and Marjorie Jackson have so moved. On August 24, 1977, the motions to intervene filed by Portia Williams and Dorothy Hooks were denied. The court in this order will reconsider that ruling.

2. Justiciability may also focus on whether the issue raised is a political question, whether the parties are asking for an advisory opinion, and whether the matter is moot. *Flast v. Cohen, supra*, 392 U.S. at 95, 88 S.Ct. 1942.

under color of state law consisting of illegal bond setting, sentencing and jury fee practices which allegedly violated the constitutional rights of the class members. Because none of the named plaintiffs alleged that he had suffered any injury from these practices, however, the court found that the representatives lacked standing. "[I]f none of the named plaintiffs purporting to represent a class establishes the requisite of a case or controversy with the defendants, none may seek relief on behalf of himself or any other member of the class." *Id.* at 494, 94 S.Ct. at 675. *See Bailey v. Patterson,* 369 U.S. 31, 32–33, 82 S.Ct. 549, 7 L.Ed.2d 512 (1962).

■ Only after the court has undertaken a Rule 23 analysis and has certified the class does the class become a jural entity, independent of the representative. *See Sosna v. Iowa,* 419 U.S. 393, 95 S.Ct. 553, 42 L.Ed.2d 532 (1975). Once certified, the class too must assert a concrete injury. Requiring injury to the class is a direct byproduct of the class' jural independence. For example, if after the class has been certified it is determined that in fact the class representative lacked standing, the certified class itself has standing to maintain the appeal. Thus in *Rizzo v. Goode,* 423 U.S. 362, 96 S.Ct. 598, 46 L.Ed.2d 561 (1976), the Supreme Court found that the class representatives lacked Article III standing to sue. Rather than stopping its analysis at this point, the court noted that the case was not before it on the pleadings—the class had been certified. It then proceeded to examine the merits of the case. Similarly, in *Sosna v. Iowa, supra,* the court recognized that a class, once certified, gains an independent stature which the mootness of the representative's claim could not affect.

The Fifth Circuit in its decisions, has also looked both to the class representative and to the class in its inquiry into standing. In *Payne v. Travenol Laboratories, Inc.,* 565 F.2d 895 (5th Cir. 1978), the class representatives who met the employer's requirement of a tenth grade education at the time suit was filed were found to lack standing to attack that rule. Significantly, when the circuit considered the case, the class had already been certified. The court looked to both the named plaintiff and the certified class to determine standing. The class was explicitly defined so as to exclude those people who lacked tenth grade education. There were thus no circumstances under which that requirement could have caused either the plaintiffs or any member of the class the "distinct and palpable injury" that Article III requires. Finding that neither could possibly have suffered the claimed injury, the court held that Article III's requirements were not satisfied.

For meaningful analysis, this question of whether the entities before the court satisfy Article III's requirement of an injury in fact ought to be separate from and should not be confused with the inquiry into the relationship between the class representative and the putative class. Although courts sometimes mistakenly analyze the link between the representative and the putative class in Article III terms, that relationship is defined by Rule 23. This analysis is implicit in both *East Texas Motor Freight Systems, Inc. v. Rodriquez,* 431 U.S. 395, 97 S.Ct. 1891, 52 L.Ed.2d 453 (1977) and *Satterwhite v. City of Greenville,* 578 F.2d 987 (5th Cir. 1978), two cases on which the defendant relies.

In *Rodriquez,* three Mexican-American city truckdrivers charged that their employer's no-transfer and seniority policies amounted to racial and ethnic discrimination in violation of Title VII. These three city truckdrivers asserted this claim on behalf of all blacks and Mexican-Americans whom the defendant had denied equal employment opportunities. Because the three city truckdrivers failed to move for class certification and stipulated that the only claim before the court was the employer's rejection of their applications for transfer, the trial court dismissed the class allegations. Finding that the three city truckdrivers were not qualified for the over-the-road job they wanted and that the no-transfer seniority practices were proper business practices applied without discriminatory

purpose, the trial court denied the individual claims for relief. Thus at the time of appeal to the circuit, no class had been certified and the three proffered class representatives had not been injured by the practices of which the putative class complained.

On appeal, the Fifth Circuit reversed. It certified a class of Mexican-American and black city driver employees covered by certain collective bargaining agreements and found unlawful the company's no-transfer rule.

The Supreme Court then reversed the circuit decision and held that the court of appeals had erred in certifying the class. Significantly, it did not address the standing of the representatives to raise the class claims. Rather it focused on the inability of the named plaintiffs under Rule 23 adequately to represent the putative class. The court emphasized that because the trial court had found them unqualified for transfer, the plaintiffs were not members of the class they purported to represent. Having suffered no injury from the alleged discriminatory practice, they were "simply not eligible to represent a class of persons who did allegedly suffer injury," and thus were inadequate representatives under Rule 23(a). *Id.* 431 U.S. at 404, 97 S.Ct. at 1897. The court further found the representatives inadequate because they had failed to move for class certification and because their demand for a merger of two collective bargaining units conflicted with a vote by members of the class rejecting just such a merger. It is thus in the context of Rule 23's requirement of fair and adequate representation that the court's language that a class representative must " 'possess the same interest and suffer the same injury' as the class members" must be read.

*Satterwhite* presents a comparable analysis. In that case, as in *Rodriquez*, the trial court refused to certify the proposed class, then dismissed the plaintiff's claim on the merits. The Fifth Circuit panel affirmed on the merits as to her individual claim but reversed the denial of class certification. En banc, the Fifth Circuit vacated the panel decision. As in *Rodriquez*, the court measured the plaintiff's ability to represent the purported class not against the requirements of Article III, but against the criteria of Rule 23.[3] Never having suffered an injury "either in common with the class or otherwise," the plaintiff was not a member of the class she sought to represent. Her claim was not typical of the class and her representation inadequate. The court stated:

> [H]er lack of nexus with, and membership in, the class is fatal. 578 F.2d at 992.

 In a class action, then, the trial court initially must address whether the named plaintiffs have standing under Article III to assert their individual claims. If that initial test is met, the court must then scrutinize the putative class and its representatives to determine whether the relationship between them is such that under the requirements of Rule 23 the named plaintiffs may represent the class. The trial court generally need not address the final question of whether the class itself, after certification, has standing. If that court, guided by the nature and purpose of the substantive law on which the plaintiffs base their claims, properly applies Rule 23, then the certified class must necessarily have standing as an entity. Because the trial court undoubtedly will have applied the rule in a manner that it thought proper, its answer to the question of whether the certified class has standing will almost invariably be in the affirmative.[4] Of course a court could apply Rule 23 so loosely as to result in the certification of a class that lacked standing. That such a situation could arise demonstrates the conceptual similarity and occasional overlap of Article III and Rule 23. It follows that a discrete

---

3. The court explicitly noted that *Rodriquez* was a Rule 23 case and not a standing case. *Id.* at 992.

4. Of course, if the individual plaintiff's claim becomes moot or absence of injury surfaces after the class has been certified, the trial court properly should determine whether the class has standing.

and sequenced examination of the requirements of Article III and Rule 23 is needed to best highlight their differences. The degree of attenuation between the plaintiffs' claims and those of the class members ought not raise Article III questions. Instead the court must study those differences in light of Rule 23's requirements of class membership commonality, typicality, and adequacy, read in a manner congruent with the substantive policies of Title VII.

▇ Both Vuyanich and Johnson assert concrete injury from the putatively illegal action of the defendant in violating 42 U.S.C. § 2000e-5. They each allege such a personal stake in the controversy's outcome as to give this court the power under Article III to hear both their complaint and those they raise on behalf of the putative class. What must be decided, then, is the scope of the class these plaintiffs may represent. That question, as discussed above, is not a question of standing under Article III, but rather a question of the relationship between the plaintiffs and the class they seek to represent. Its resolution turns on the application of the requirements of Rule 23 to the facts of this case.

### III. TITLE VII

▇ That Rule 23 is procedural does not mean that it is to be read in a vacuum. The manner and scope of its application depend not on Article III or on the rule's inherent boundaries, but on the nature and purpose of the substantive law to be enforced. That is, Rule 23 must be read in the context of the substantive law of the asserted claims. Indeed, the body of Rule 23 law is virtually incomprehensible unless the cases are viewed as fashioning distinct approaches for distinct substantive areas. The plaintiffs in this case bring their claims and those of the class under Title VII, 42 U.S.C. § 2000e-5. Therefore, this court ought to apply the standards of Rule 23 to the purported class and its representatives with its gaze leveled at Congress' intent in enacting Title VII. That view is a by-product of the core principle that Article III is essentially a limitation upon the courts and not upon the Congress.

The Civil Rights Act of 1964, of which Title VII is a part, was the first comprehensive legislation ever to address the pervasive problem of discrimination against minorities—primarily blacks—in American society. Extensive hearings had focused Congress' attention on the adverse social and economic consequences of discrimination against minorities in employment and other fields. *See, e. g.,* Hearings on Civil Rights before Subcomm. No. 5 of the House Comm. on the Judiciary, 88th Cong., 1st Sess. 2300–03 (1903).

The Congress perceived that employment discrimination was having a destructive impact not only on those excluded who are "forced into a condition of marginal existence" but also on the nation as a whole which is deprived of "the full benefit of the skills, intelligence, cultural endeavor and general excellence" of the victims of discrimination. 2 U.S.Code Cong. & Admin. News, pp. 2355, 2514 (1964). The Congress further believed employment discrimination lay at the heart of all other forms of discrimination—that a promise of voting rights or equal access to public facilities would have slight value without the elimination of discrimination in employment. "The rights of citizenship mean little if an individual is unable to gain the economic wherewithal to enjoy or properly utilize them." *Id.* at 2516 (1964).

Congress recognized that "more positive and enduring steps must be taken, therefore, to cure this evil and before racial unrest eats irretrievably into the body of the American industrial system." *Id.* at 2515. The House and Senate Reports reveal that the law the Congress enacted was intended to be a broad remedial measure, the purpose of which was to eliminate the widespread shameful conditions.

[I]n the last decade it has become increasingly clear that progress has been too slow and that national legislation is required to meet a national need which becomes ever more obvious. That need is evidenced, on the one hand, by a growing impatience by the victims of discrimina-

tion with its continuance and, on the other hand, by a growing recognition on the part of all of our people of the incompatibility of such discrimination with our ideals and the principles to which this country is dedicated. A number of provisions of the Constitution of the United States clearly supply the means "to secure these rights," and H.R. 7152, as amended, resting upon this authority, is designed as a step toward eradicating significant areas of discrimination on a nationwide basis. It is *general in application and national in scope.* (emphasis added) House Rep. 914, *Id.* at 2393; *See* Sen.Rep. No. 872, *Id.* at 2377.

■ This court must apply Rule 23 with a view toward fulfillment of Congress' purposes. It must read Rule 23's standards with sufficient breadth to carry out Congress' goal that employment discrimination be eliminated as expeditiously, thoroughly, and finally as possible. The court ought not to address the class question in the context of Article III "standing." That approach deemphasizes congressional purpose and freights analysis with an introspective concern of impact on the courts and with the full range of forces articulated, and unspoken, that open and close judicial doors. It risks substitution of judicial for legislative goal-setting through a by-passing of congressional concerns that underlie the substantive claims before the court— not wholly unlike the operation of substantive due process. Pointedly, the vitality of across-the-board suits ought not be decided in the milieu of prudential limitation. Instead it ought to be decided in the context of congressional objective; particularly so when those objectives are broadly stated and the means of achieving them are largely left to the courts. Guided by these principles, the court now turns to Rule 23 itself.

## IV. RULE 23(a)

■ It is well established that in order for a suit to be maintained as a class action, each of the four requirements specified in Rule 23(a) must be satisfied. If any one of the four tests is not met, the court must refuse to certify the class. *See Huff v. N. D. Cass Co. of Alabama*, 485 F.2d 710, 712 (5th Cir. 1973); *Eisen v. Carlisle & Jacquelin*, 391 F.2d 555, 556 (2d Cir. 1968). There is no question that in this case subsection (a)(1), the requirement that the class be so numerous as to render joinder of all members impracticable, has been met. Defendant disputes plaintiffs' contention that the remaining three requirements are also satisfied—that there are questions of law or fact common to the class; that the claims of the representative parties are typical of the class claims; and that the representative parties will fairly and adequately protect the class interests. Each element of Rule 23(a) will be examined seriatim.

### A. *Commonality.*

■ The existence of common questions under Rule 23(a)(2) is implicit in the finding under subsection (b)(2) that "the party opposing the class acted or refused to act on grounds generally applicable to the class." Many courts because of this apparent superfluity have either ignored or glossed over this requirement. *See* 3B J. Moore, Federal Practice ¶ 23.06–1. Where courts have considered the issue, they have found Rule 23(a)(2) does not require that all questions of law and fact be identical, but rather that a question of law or fact be presented that inheres in the complaints of all the class members. *See Escalera v. New York City Housing Authority*, 425 F.2d 853 (2d Cir.), *cert. denied*, 400 U.S. 853, 91 S.Ct. 54, 27 L.Ed.2d 91 (1970); *Norwalk CORE v. Norwalk Redevelopment Agency*, 395 F.2d 920, 937 (2d Cir. 1968).

Plaintiffs, to demonstrate the existence of a common question, introduced statistics which tended to support their claims that class questions exist with regard to whether through a number of different practices the defendant's discriminatory animus injured

the members [5] of the class.[6] In this case, then, the common question of fact is whether the defendant bank engaged in discrimination against blacks and women. That the discrimination may have manifested itself in a variety of contexts including, but not limited to, hiring, promotions, job classifications, training, and pay, does not detract from the commonality of the class members' and representatives' claims.

It bears emphasis that at this stage of the proceeding the question is whether there are common questions and not whether the defendant is actually guilty of discrimination. Of course a plaintiff must do more to demonstrate the existence of the question than simply assert its existence. Bare bones conclusions are insufficient. At the same time, a plaintiff need not make out a prima facie case of liability. The higher courts have not yet articulated where between these marks a plaintiff must place his proof. The Bank's evidence introduced to rebut plaintiffs' statistics [7] tends to show

5. As discussed, *infra*, however, the court's division of the large class into a number of subclasses reveals that the statistics do not demonstrate the existence of common questions as to one of the subclasses.

6. That evidence indicated that during the six-month period from October, 1970, through March, 1971, 100% of the persons hired into officer positions were white males, whereas only 23% of those hired into nonofficer positions were white males. Plaintiffs also introduced "Defendant's Review of Affirmative Action Goals—1972" indicating that no females or minorities had been in the training programs for banking services, the trust department, or commercial banking.

Plaintiffs' statistics on job classification also indicate the existence of a common question— whether the bank discriminates against blacks and women. In April, 1975, white males held 87.1% of the officer positions, females held 11.1% and blacks held 0.2%. Of the exempt positions, white males occupied 77.2%, females 19.4% and blacks 1.8%. As of December, 1977, in the top five executive positions there were 140 occupants; no females or blacks were in the top four positions while four females and no blacks were in the fifth category. Plaintiffs also introduced defendant's 1977 EEO–1 which set out the recent employment picture of the 2,297 bank employees. Although 36.31% of the employees were white males, they occupied 80.14% of the officer/manager jobs. White women, comprising 43.67% of the work force, held 15.89% of the officer/manager positions. Blacks comprised 13.93% of the total work force, but held ten of the 579 officer/manager positions, or 1.73%.

According to plaintiffs' statistics, females held only 7.4% of all exempt classifications by the end of 1971, and by the end of 1972, held 11.9% of the exempt positions. Of the 43 exempt employees hired between June 1, 1971, and November 1, 1971, 81% were male and 19% were female. Although women comprised 59.8% of the Bank's work force as of May 15, 1974, they occupied 16.7% of the exempt classifications and 9.4% of the officer positions. Whereas 679 of the 918 males held jobs where the minimum salary exceeded $540 per month, 186 of the 1,367 females held such jobs.

As of December 8, 1971, although overall minority employment at the Bank was about 15%, no minorities were in Personnel, and none were in Paying and Receiving Tellers, Note Tellers, Customer Consultants, or New Accounts Clerks. The General Service Group of the Bank, however, was 20% minority. In December, 1972, four bank sections were over 30% minority and one was over 50% minority. In July, 1976, 82.7% of all blacks were employed in the Finance and Administration department. As of May 15, 1974, blacks comprised 14.6% of the Bank's work force, but they primarily occupied the nonexempt grades from one to six and held only 1.4% of the exempt classifications. Only 0.21% of the officers were blacks and only eleven of the 334 blacks employed at the Bank earned between $10,000 and $18,000 per year.

7. By the following figures, the Bank intended to prove that the applicant flow determined the sex breakdown of the hires, and that women applied for exempt positions much less frequently than men. The Bank also sought to demonstrate that proportionately more women exempt applicants were hired than male applicants.

| | Male | Female |
|---|---|---|
| % hires 1971 exempt | 85.9 | 14.1 |
| % applicants 1971 exempt | 87.3 | 12.7 |
| % hires 1972 exempt | 84.3 | 15.7 |
| % applicants 1972 exempt | 87.0 | 13.0 |
| % hires 1973 exempt | 82.9 | 17.1 |
| % applicants 1973 exempt | 86.2 | 13.8 |
| % hires 1974 exempt | 83.4 | 16.6 |
| % applicants 1974 exempt | 86.0 | 14.0 |
| % hires 1976 exempt | 74.7 | 25.3 |
| % applicants 1976 exempt | 80.9 | 19.1 |
| % hires 1977 exempt | 88.3 | 31.7 |
| % applicants 1977 exempt | 78.0 | 22.0 |
| % hires 1978 exempt | 65.6 | 34.4 |
| % applicants 1978 exempt | 74.4 | 25.6 |

Defendant's exhibits also demonstrated that for management training positions and all exempt positions in 1971, the rate of female-hires exceeded the rate of female applications.

that its position of denial may not be insubstantial. But the sum of plaintiffs' and defendant's statistics points to the conclusion that in the liability phase of this proceeding, the court will have the duty of resolving certain contested issues of fact and law; that is, common questions do exist.

B. *Typicality.*

Rule 23(a)(3) focuses the court's attention on the nature of the representative's claims. It requires a determination of whether, given the fact that the representative raises some question of law or fact that is common to the class, the remaining issues and possible defenses are also typical.

 Defendant attacks the typicality of plaintiffs' claims on numerous grounds. First, the Bank argues that if true, the facts that Vuyanich alleges are unique. It contends that Vuyanich, who complains of discriminatory treatment because of her interracial marriage, only raises claims typical of those who also allege discriminatory treatment as a result of an interracial marriage. Vuyanich's claim, like that of all class members, is of discrimination. The fact that the discrimination may have manifested itself in disapproval of her mixed marriage does not render her complaint any less typical. Defendant also contends that Vuyanich's termination was simply a personnel decision that resulted from a personality conflict with other employees. The fact that at trial defendant may raise this matter as a defense does not render Vuyanich an improper class representative. It is only logical that any employer would assert that the treatment of a particular employee was a justifiable personnel decision and not an instance of discrimination. Such a defense is thus typical. Furthermore, in *Rod-*

*riquez,* the Supreme Court made clear that even if a class representative of a certified class ultimately loses her individual claim on the merits, the class claim can still stand. *East Texas Motor Freight System, Inc. v. Rodriquez, supra,* 431 U.S. at 406, n.12, 97 S.Ct. 1891; *Satterwhite v. City of Greenville, supra,* 578 F.2d at 994 (1978).

Second, the Bank claims that because its structure is so massive and decentralized and the positions its employees hold are so varied, the claims of Vuyanich and Johnson cannot be typical. It argues that the typicality requirement allows a plaintiff in this case to represent only those employees who held the same position in the Bank as she did and complain of the precise employment practice that she does.

 The law does not mandate a holding that a plaintiff complaining of one employment practice cannot represent an employee complaining of a different employment practice. Indeed, the purposes of Title VII counsel in favor of across-the-board representation. Recent Fifth Circuit cases have endorsed such suits. *See Satterwhite v. City of Greenville, supra,* 578 F.2d 987; *Payne v. Travenol Laboratories, Inc., supra,* 565 F.2d 895. The court in *Payne* permitted the named plaintiffs to represent the class of persons injured by the employer's college degree requirement even though the plaintiffs, because they lacked other qualifications necessary to obtain the position for which a college degree was but one prerequisite, were not harmed by the requirement. The court stated:

> Plaintiffs' action is an "across the board" attack on unequal employment practices alleged to have been committed by Travenol pursuant to a policy of racial discrimination. As parties who have al-

Defendant introduced the following evidence to demonstrate that women and black exempt employees received promotions in equal or greater proportions than white male exempt employees:

| Date | | Black | White Male | White Female |
|---|---|---|---|---|
| 1973 | % Promotions | 1.2 | 77.8 | 18.1 |
| 1973 | % Work Force | .5 | 83.6 | 14.9 |
| 1974 | % Promotions | 1.9 | 80.9 | 15.1 |

| Date | | Black | White Male | White Female |
|---|---|---|---|---|
| 1974 | % Work Force | 1.0 | 81.9 | 15.4 |
| 1975 | % Promotions | 2.3 | 78.3 | 16.1 |
| 1975 | % Work Force | 1.6 | 78.8 | 17.0 |
| 1976 | % Promotions | 1.1 | 68.9 | 25.7 |
| 1976 | % Work Force | 2.2 | 75.8 | 19.1 |
| 1977 | % Promotions | 0.7 | 75.4 | 19.9 |
| 1977 | % Work Force | 1.9 | 73.5 | 21.8 |
| 1978 | % Promotions | 3.2 | 70.2 | 25.8 |
| 1978 | % Work Force | 2.7 | 70.3 | 23.9 |

legedly been aggrieved by some of those discriminatory practices, plaintiffs have demonstrated a sufficient nexus to enable them to represent other class members suffering from different practices motivated by the same policies. 565 F.2d at 900.

The more recent en banc decision in *Satterwhite v. City of Greenville, supra*, 578 F.2d 987, contains language explicitly approving across-the-board suits in which the class representative asserts a discriminatory animus which manifests itself in a variety of discriminatory practices, some of which may not have caused the representative's injury but which nonetheless injured certain members of the class. The court stated, "It is not necessary that the representative suffer discrimination in the same way as other class members, but it is necessary that she suffer from discrimination in some respect." *Id.* at 993–994, n.8.

*East Texas Motor Freight Systems, Inc. v. Rodriquez, supra*, 431 U.S. at 403, 97 S.Ct. at 1896, which held a class representative must " 'possess the same interest and suffer the same injury' " as the members of the class, does not preclude such representation. The class representative in *Rodriquez*, unlike the plaintiffs and intervenors in this case, had suffered no injury. The "same interest/same injury" test must be read and understood in that context. It does not require an identical harm resulting from the same type of practice.[8]

▇▇▇▇▇ While the typicality requirement does not prohibit across-the-board

representation, in certain cases subclassing under Rule 23(c)(4) according to the practice of which the members complain serves to facilitate the proceedings. The evidence thus far before the court indicates that the creation of a subclass of applicants is appropriate. The responsibility for hiring new employees rests heavily on the Personnel Department. Personnel determines whether an applicant is seeking an exempt or nonexempt position. The department hires nonexempt employees and steers exempt applicants to particular openings. It does not appear at this time, however, that further subclassing according to the different practices alleged would expedite the trial. The remaining challenged practices including promotion, pay, training, testing, transfer, job assignment and classification, job content, and constructive discharge are intertwined. A denial of training, for example, will affect promotion; testing may affect transfer; a variety of discriminatory practices may drive a person to resign. Unlike Personnel's role in hiring, a separate department is not primarily responsible for each of these practices. It is then not surprising that Vuyanich and each intervenor contends in her complaint, affidavit, or testimony that she personally was injured by all or most of the practices. The fact that different practices are challenged therefore only warrants a class division into applicant and employee subclasses.

The existence of different job classifications also merits subclassing. The Bank's work force is divided into exempt and non-

---

8. The Fourth Circuit has interpreted *Rodriquez* in a contrary manner. In *Hill v. Western Electric Co.*, 596 F.2d 99 (4th Cir. 1979), six black male and female plaintiffs alleged Western Electric had engaged in a pattern of discrimination against blacks and females in hiring, job assignments, and promotions in its facilities in Arlington, Virginia. The trial court certified the broad class but the circuit, relying on *Rodriquez*, reversed in part. The court held *Rodriquez* "is not broad enough to permit a named representative to represent a class of people who suffered different injury or those having similar claims but who are employed in other facilities." *Id.* at p. 102. Judge Haynsworth added that "a named plaintiff may represent a class of persons whose injuries and

interests are of a kind with the representative's. A person who has been injured by unlawful, discriminatory promotion practices in one department of a single facility may represent others who have been injured by the same discriminatory promotion practices in other departments of the same facility." *Id.*

The Fifth Circuit, in *Satterwhite* and *Payne*, clearly rejected the Fourth Circuit's view of *Rodriquez*. Even if *Western Electric* were the law in this circuit, however, this court's decision today would not be in conflict with it. As discussed, *infra*, each representative of the various subclasses created by this opinion complains of the same practices that allegedly injured the members of her subclass.

exempt employees. Exempt employees have managerial responsibilities whereas nonexempt employees perform largely clerical duties. Exempt employees are the decision- and policy-makers. Their skills are specialized. The skills of nonexempt clerical employees, however, are transferable not only to different banks, but also to a variety of institutions and businesses. Because of these differences, separate groups of employees in Personnel screen and interview applicants for exempt and nonexempt positions. The method of compensating employees in the two classifications is also different. Unlike exempt employees, nonexempt employees are within the protection of the Fair Labor Standards Act and thus receive (or at least are entitled to receive) overtime pay. Exempt, unlike nonexempt, are ranked and compensated according to the so-called "Hay System." These and other differences will undoubtedly prompt plaintiffs at trial to introduce different sets of statistics in an effort to demonstrate discrimination among exempt employees and applicants and nonexempt employees and applicants. Statistics on the promotions of all female employees, for example, may not accurately reflect the rate of female promotions into exempt positions. Data on the total number of women hired may not parallel figures on the number of females hired into exempt positions. Because of the differences between exempt and nonexempt classifications and the effect these differences will have on the presentation of evidence, it now appears appropriate further to divide the class into subclasses of exempt employees, nonexempt employees, exempt applicants, and nonexempt applicants.

### C. Adequacy.

#### 1. Conflicts of Interest.

■ Adequacy of class representation is crucial to assure that the absent class members are not deprived of due process and that the final judgment is binding. A court, in assessing a representative's adequacy, must focus initially on the interrelated questions of attorney competence and any conflicts with the interests of the class members. Competency of counsel means more than mere technical competence. Although the class is not the client, the class attorney owes a duty to each member of the class. See Mandujano v. Basic Vegetable Products, Inc., 541 F.2d 832 (9th Cir. 1976). Thus lack of congruence among the interests of the class representatives and the class members may render the attorney, despite his diligence, unable to counsel the class members and the plaintiffs fully and fairly. Harriss v. Pan American World Airways, Inc., 74 F.R.D. 24, 43 (N.D.Cal.1977).

■ A class representative who, as a result of interests at variance with those of other class members, cripples his attorney's ability to counsel the class is not an adequate representative within the meaning of Rule 23(a)(4). If a representative's interests are antagonistic to those of other class members, the claims of absence members may be lost. Those same claims might have been successfully asserted had the class been properly framed. A class member whose claims are not protected due to inadequate representation thus may collaterally attack the judgment. Gonzales v. Cassidy, 474 F.2d 67 (5th Cir. 1973). To protect a defendant against inconsistent adjudications and the expense of defending several suits, a court must carefully scrutinize for conflicts a class and its representatives.

Defendant contends that a named plaintiff's attempted representation of both blacks and females inevitably produces antagonistic interests. The Bank argues that the representative must assert as a woman that the employer favors all men, including black men, and as a black that the employer favors all whites, including white women. It submits that the conflicts that emerge between the representative and black male class members and between the representative and white female class members make the attorney unable to counsel the class properly and the named plaintiff an inadequate representative.

■ This court is unwilling to hold as a matter of law that no black female

could represent without conflict the interests of both blacks and females. Such representative could legitimately assert that the employer discriminates against all blacks and women and favors white males. *See, e. g., Donaldson v. Pillsbury Co.*, 554 F.2d 825 (8th Cir. 1977).

The proper inquiry must be whether the facts of a particular case indicate that such fundamental antagonism actually exists or is likely to result from dual representation. In this case, an examination of the testimony at the class certification hearing and in depositions reveals that a conflict between the claims of black nonexempt employees and female nonexempt employees may render representation of both groups by a black female inadequate within the meaning of Rule 23(a)(4). Vuyanich, a black female, asserts that her termination resulted in part from conflicts with racist white female co-workers. A witness at the certification hearing testified that black females once planned a walkout to protest the promotion to a secretarial position of a white female instead of a black female. Proposed intervenor Dorothy Hooks testified that white females had better pay and promotional opportunities than black females. Several deponents described racist attitudes of their white female supervisors.

The solution to this problem of potentially inadequate representation is to establish subclasses. Rule 23(c)(4), which enables courts to restructure complex cases so as to satisfy Rule 23(a)'s requirements, empowers the court to "treat common things in common and distinguish the distinguishable." *Jenkins v. United Gas Corp.*, 400 F.2d 28, 35 (5th Cir. 1968). The use of subclassing to separate adverse class members is not uncommon. *See Carr v. Conoco Plastics, Inc.*, 423 F.2d 57, 58 (5th Cir.), *cert. denied*, 400 U.S. 951, 91 S.Ct. 241, 27 L.Ed.2d 257 (1970). The facts of this case warrant the further division of the nonexempt employee subclass into two units, one of blacks of both sexes, and one of females of both races.

At this time, there is no evidence indicating an actual or potential conflict also exists between black exempt employees and female exempt employees. No testimony pointed to the existence of such a conflict. Furthermore, the number of black and female exempt employees is sufficiently small to support the view that a conflict between them is unlikely. Thus, there is no need at this stage in the proceeding to create separate subclasses of black and female exempt employees. The potential conflict of interest among applicants mirrors that among employees. Because a large number of nonexempt employees have been white females, a black applicant for a nonexempt position might easily contend that a white female was hired in his or her place. Thus there should be a subclass of black applicants for nonexempt positions and one of female applicants for nonexempt positions. At this time the evidence does not reveal, however, a similar potential conflict between black and female applicants for exempt positions. Because the number of females and blacks hired into the exempt ranks has been relatively small, it does not appear likely that a white female applicant will argue a black was hired in her stead or that a black male will contend a female took his or her place. Furthermore, there has been no testimony indicating such a conflict exists. Subclasses of black and female exempt applicants are thus unnecessary.

██ Because of potential conflicts of interest among certain of the various subclasses, present counsel cannot represent the members of all subclasses. From the beginning, Linda Coffee has represented Ellen Johnson. Ms. Johnson, as discussed below, is the class representative for the subclasses of black nonexempt applicants, black and female exempt applicants, and black and female exempt employees. Because the court does not now perceive a potential conflict arising out of Ms. Coffee's representation of those subclasses, she may continue as their counsel. Joanne Peters represents Joan Vuyanich who is a class representative of nonexempt black employees. Ms. Peters may continue as counsel for that subclass. Ms. Peters may also represent, with Ms. Coffee, the subclasses of

black nonexempt applicants, black and female exempt applicants, and black and female exempt employees. Ms. Coffee likewise may join with Ms. Peters in representing black nonexempt employees.

The court has found a potential conflict between black nonexempt employees and female nonexempt employees. Therefore, Ms. Peters cannot continue as counsel for the female nonexempt employee subclass. That same potential conflict exists between black nonexempt applicants and female nonexempt employees. Ms. Coffee thus is precluded from representing the female nonexempt employee subclass.

### 2. Incentive and Ability to Represent.

The Bank disputes the plaintiffs' incentive to prosecute the suit due to their "equivocal" interest in being rehired. First, a requirement that a former employee class representative seek reemployment is inconsistent with "across-the-board" suits. See Johnson v. Georgia Highway Express, Inc., 417 F.2d 1122 (5th Cir. 1969). Furthermore, it should be noted that both Vuyanich and Johnson do seek reemployment at the Bank. The fact that each has testified that she would insist on being restored to her rightful position does not render her interest equivocal.[9]

Defendant also contends that because of the plaintiffs' lack of recent contact with the Bank, they are inadequate representatives of recent or present employees and their claims are atypical of that group. Vuyanich was last employed almost ten years ago and eight years have passed since Johnson applied for a job. The Bank argues that in the interim, many changes in employment practices and conditions have occurred. The job grade system has been restructured; a procedure was adopted whereby all new positions and vacancies were to be posted; modifications in maternity leave policies and uniform requirements have taken place. Defendant claims that the matters to which the plaintiffs will testify simply do not pertain to the circumstances confronting present employees.

The Fifth Circuit, in allowing former employees to represent present employees, has implicitly found that a certain lapse of time does not in itself render representation inadequate. In this case, much of the time that has passed since plaintiffs departed the Bank is not chargeable to them or their counsel. Both plaintiffs filed their EEOC charges within 180 days after the alleged discrimination occurred, as the Act requires. 42 U.S.C. § 2000e–5(d). When they received their right to sue letters, they again followed the Act's timetable and promptly filed suit in federal court within 90 days. 42 U.S.C. § 2000e–5(f)(1). The lapse of time between their departure from the Bank and the trial of this suit is a function of the judicial process and is beyond their control. After this case was filed, it was transferred to four different courts before reaching this one. Furthermore, a not inconsiderable amount of time was spent in discovery squabbles. Despite these setbacks, plaintiffs persisted in their claims. This court is unwilling to penalize the class or the plaintiffs for this lengthy procedure and does not find the plaintiffs inadequate on the ground that time has passed since they left the Bank. Rather, it will allow intervenors who were more recently employed at the Bank to bolster the class representation. This approach should encourage more prompt disposition of claims such as this one. A defendant who prolongs a proceeding may be simply increasing his liability. A contrary holding would provide incentive for defendants to drag their feet, for the sheer lapse of time would render representation inadequate.

### V. INTERVENTION

Rule 23(d) makes specific provision for the intervention of class members into class actions. Subdivision (d)(2) empowers the court in any type of class action to encourage members of the class "to intervene and present claims or defenses, or otherwise come into the action."

---

**9.** Their interest in being rehired demonstrates that even if they were not representing a class, they would be able individually to seek injunctive relief.

The rule, giving the courts broad discretion, permits intervention for two general purposes—"for the protection of the members of the class or otherwise for the fair conduct of the action." These two purposes mirror the two types of intervention which Rule 24 allows—intervention as of right and permissive intervention. Rule 24 thus governs class action intervention. Advisory Committee Note, Fed.R.Civ.P. 24(a), 39 F.R.D. 109. Because class members will be bound by the court's judgment, intervention should be allowed under Rule 24(a) as of right whenever it appears that the named representative cannot adequately represent the interests of the class. *See* 7A C. Wright & A. Miller § 1799. A class member "should not be put to the risk of having a judgment entered in the action which by its terms extends to him, and be obliged to test the validity of the judgment as applied to his interest by a later collateral attack. Rather he should, as a general rule, be entitled to intervene in the action." Advisory Committee Note, Fed.R.Civ.P. 24(a), 39 F.R.D. 110. If the court determines that the interests of the class are fully protected, however, the court should have discretion either to deny the intervention or to permit it "for the fair conduct of the action." Fed.R.Civ.P. 23(d)(2).

Following these general principles, the Supreme Court and Fifth Circuit have allowed additional plaintiffs to represent a class when it appears that the named plaintiff either does not satisfy one of the criteria of Rule 23(a) or is not as strong a representative as he or she might be. In *United Airlines, Inc. v. McDonald*, 432 U.S. 385, 394, 97 S.Ct. 2464, 2470, 53 L.Ed.2d 423 (1977), the court upheld the right of a member of a putative class to intervene for purposes of appealing the trial court's denial of class certification even after a judgment had been entered. The court, in allowing the intervention, observed that the denial of certification proved that "the unnamed class members would no longer be protected by the named class representatives." In *Oatis v. Crown Zellerbach*, 398 F.2d 496 (5th Cir. 1968), the court encouraged the participation of additional plaintiffs who could better represent possible subclasses even though it did not find that the named plaintiff was an inadequate representative. The class members were black employees who worked in a number of different departments of the defendant. The court observed that, "due to the inapplicability of some of the issues to all members of the class, the proceeding might be facilitated by the use of subclasses." *Id.* at 499. It stated that co-plaintiffs from other departments could represent subclasses composed of members of those departments "so as to fairly and adequately protect their interests." *Id.* While it is true that *Oatis* did not involve proposed intervenors, its principle is nonetheless applicable to this case: even if the court does not find the named plaintiff inadequate, it should allow such intervention as will make the representation even stronger and protect the class members most completely.

The question of whether the proposed intervenors will strengthen the representation in this case is complicated by the fact that none of the proposed intervenors except Elizabeth King have exhausted their administrative remedies. If that nonexhaustion either bars their claims or so limits them as to destroy the benefits of intervention, the court will deny the intervenors' motions.

Intervenors in Title VII class actions are not required to have exhausted their administrative remedies. In *Oatis v. Crown Zellerbach, supra*, 398 F.2d at 499, the court held that as long as one plaintiff in a litigation had filed a charge with the EEOC, the co-plaintiffs were not also required to exhaust administrative remedies. It was found sufficient that the co-plaintiffs were members of the class. The Fifth Circuit has extended the *Oatis* rule, which technically applied only to co-plaintiffs, to intervenors in Title VII cases. *Wheeler v. American Home Products Corp.*, 563 F.2d 1233 (5th Cir. 1977); *Olivares v. Martin*, 555 F.2d 1192 (5th Cir. 1977).

An intervenor who has not exhausted his administrative remedies is limited in his

claims, however. *Oatis* permitted nonexhausting co-plaintiffs to represent the class because they raised "the same or some of the issues" raised by the exhausting plaintiff. Explaining further, the court held: "They, as co-plaintiffs, must proceed . . within the periphery of the issues which [the exhausting plaintiff] could assert." 398 F.2d at 499. An exhausting plaintiff may only assert those issues which he raised in his administrative complaint, together with any matters that may reasonably be expected to grow out of that complaint. *Sanchez v. Standard Brands, Inc.*, 431 F.2d 455 (5th Cir. 1970). This limitation, however, does not prohibit across-the-board suits. A plaintiff whose EEOC charge only alleged a single discriminatory practice may complain on behalf of the class of other discriminatory employment practices committed by the same employer. *See, e. g., Carr v. Conoco Plastics, Inc., supra,* 423 F.2d at 65. Thus a nonexhausting intervenor may raise those issues that the exhausting plaintiff could assert in an across-the-board suit.

The intervenors in this suit do not raise any issues that differ from those raised by Johnson and Vuyanich. On her own behalf and on behalf of the class, Johnson asserts sex and race discrimination in hiring, job classifications and qualifications, promotions, training, rules and regulations, and practices that otherwise deprived the class members of equal employment opportunities. Vuyanich claims on behalf of herself and the class sex and race discrimination in compensation, classification, hiring training, promotion, transfer, work conditions, and termination.[10] The intervenors collectively assert discrimination on the basis of race and sex in compensation, training, promotion, transfer, job classification, job assignment, work conditions, and termination. Thus these claims all fall within the confines of *Oatis* and *Standard Brands* and

may all be raised by any intervenors whose motions the court grants.

This opinion has created six potential subclasses: blacks and females who applied unsuccessfully for exempt positions; blacks who applied unsuccessfully for nonexempt positions; unsuccessful female applicants for nonexempt positions; black and female exempt employees; black nonexempt employees; and female nonexempt employees. Each subclass and its representative(s) must meet the requirements of Rule 23(a).

The possible subclass of female nonexempt applicants does not satisfy the commonality requirement. A large proportion of the applicants hired to fill nonexempt positions were female. There is insufficient evidence to raise a class question of whether female nonexempt applicants were victims of discrimination. Unsuccessful female applicants for nonexempt positions thus should not be part of the larger class. To that limited extent, the class is decertified.

The remaining two applicant subclasses and their representative, Johnson, satisfy Rule 23(a). The members of each subclass raise the common question of whether the Bank's refusal to hire was discriminatory. The typicality requirement is likewise satisfied. Although plaintiff Johnson applied for an exempt position, she has testified that she would have accepted an offer for a nonexempt job. Finally, she is an adequate representative of the two subclasses. She alleges that the Bank's discriminatory refusal to hire her was on the basis of both race and sex. As discussed above, the court at this time perceives no conflict between black applicants and female applicants for exempt positions. Johnson thus may represent the subclass of both black and female exempt applicants. There likewise is no conflict between Johnson, a black, and the class of black non-

---

10. Defendant contends that Vuyanich's EEOC complaint was only sufficient to support claims of race discrimination under *Sanchez v. Standard Brands, Inc.*, 431 F.2d 455 (5th Cir. 1970). When this case was before Judge Mahon, he addressed this issue, and, in a well-reasoned opinion, found that Vuyanich's EEOC complaint supported claims of both race and sex discrimination. 409 F.Supp. 1083 (N.D.Tex. 1976). This court sees no reason to disturb that ruling.

exempt applicants. These two subclasses will cover the period from April 16, 1971—180 days before Johnson filed her charge with the EEOC—until the date of trial.

Defendant contends that because in her complaint she only sought to represent a class of women, Johnson may represent females but not blacks. Johnson's complaint and EEOC charge both allege race and sex discrimination. The complaint and charge gave the defendant adequate notice that it faced a class action in which the members asserted race discrimination. Thus, her complaint does not preclude her from representing black as well as female applicants.

■ Plaintiff Johnson, although an unsuccessful applicant for an exempt position, will also represent black and female exempt employees. Because the Fifth Circuit has determined that across-the-board suits do not offend Rule 23, she may represent employees complaining of such practices as promotion, pay, and transfer. *See Satterwhite v. City v. Greenville, supra.*

■ Marjorie Lee Jackson was employed by the Bank as an exempt employee from September 13, 1971 until October 9, 1973. She worked in Estate Administration as an administrative assistant. She testified that she was the only female holding such a position at the Bank. She further testified that although she had greater responsibility than the men holding the same position, she believes that she was paid less. She stated that although officers came from the ranks of administrative assistants in her department, she was not promoted. Jackson further testified that she requested transfer into a trust new business position but was informed by a male bank officer that he did not expect to have to hire women into such positions for at least five years. Jackson, with Johnson, will represent exempt employees. There is no conflict of interest between Jackson and the subclass; her claims are typical and she is an adequate representative.

Marisu Fenton will represent nonexempt female employees. She worked for the Bank from May 22, 1972 until August 3, 1973. She complains of discrimination in job classification, training, promotion, transfer, compensation, working conditions, and job content. Although she had a degree in business administration and graduated in the top 10% of her class, she was hired as a nonexempt employee. She testified that many other educated and qualified women were in comparable positions. She further testified that even though the evaluations she received from her superiors were consistently favorable, she never received any training which would have enabled her to move into management. Nor did she receive a promotion that resulted in an increase in salary. Although Fenton was a nonexempt employee, she testified that the Bank kept no records of the hours she worked and did not pay her overtime when she worked more than 40 hours a week. She is an adequate representative of the subclass and her claims are typical.[11] Rule 23 thus is satisfied.

Vuyanich and Dorothy Hooks will represent the subclass of black nonexempt employees. As already discussed, Vuyanich raises claims that are typical of this subclass and is an adequate representative. In addition to asserting that she was terminated because of her interracial marriage, Vuyanich claims that the Bank segregated her and other blacks into departments such as Money Orders which were out of public view. She further asserts that she was paid less than her white co-workers and that despite the racial conflict between the plaintiff and her white associates, the Bank failed to transfer her to another department. Dorothy Hooks was employed by the Bank from 1963 until 1970. She complains of race discrimination in pay, promotion, training, transfer, job assignment and classification and job content. Specifically, she alleges that she, like Vuyanich, was confined to Money Orders away from the public. During the seven years that she was at

---

11. The statistics discussed in n.4, *supra*, demonstrate that Fenton's complaints concerning job classification, training, promotion, and compensation are typical of the subclass of nonexempt females.

the Bank, she worked her way up through various positions in Money Orders, but observed many white employees move at a more rapid pace. Before she became a supervisor, she was required to train several white males for supervisory positions. After Hooks complained, she was promoted to supervisor. She testified that white males holding comparable positions were paid more than she was. When a different white male became the head of Money Orders, Hooks testified that he took away her supervisory authority, and then would not allow her to transfer. She asserts that as a result of these racist practices, she was constructively discharged. She satisfies Rule 23's requirements. Because she was at the Bank for a longer period of time than Vuyanich, her testimony will bolster the class representation.

In the above three employee subclasses, the class period will extend from February 16, 1969 to the date of the trial.

The motions to intervene of Dorothy Hooks, Marjorie Jackson, and Marisu Fenton are GRANTED. The motions to intervene of Portia Williams, Elizabeth King, and Martha Davis are DENIED.

The subclass of female nonexempt employees is presently without counsel. The class representative should retain new counsel for that subclass within fifteen (15) days.