Beverly J. QUIGLEY et al.

v.

BRANIFF AIRWAYS, INC.

No. CA–3–77–0298–G.

United States District Court,
N. D. Texas,
Dallas Division.

Dec. 18, 1979.

Hal K. Gillespie, Mullinax, Wells, Mauzy & Baab, Inc., Dallas, Tex., James C. Barber, Steven B. Thorpe, Dallas, Tex., for plaintiffs.

Marilyn A. Pearson, Washington, D. C., for Association of Flight Attendants.

Thaddeus M. Sims, Amos Moses, Dallas, Tex., Laurence J. Hoffman, John J. Gallagher, Diana R. Francis, Akin, Gump, Hauer & Feld, Washington, D. C., for defendant.

## CLASS CERTIFICATION ORDER

PATRICK E. HIGGINBOTHAM, District Judge.

Plaintiff, an unsuccessful applicant for a position as a Braniff flight attendant, filed this action on March 3, 1977, alleging that she was refused employment because she is black, in violation of Title VII, 42 U.S.C. § 2000e–5. Plaintiff initially applied for a flight attendant position in 1973. She met Braniff's education requirement by possessing a G.E.D., passed a pre-interview test, and was selected for an interview. She was disqualified at the interview stage, allegedly on the basis of her weight and her unwillingness to relocate. In 1976, plaintiff entered into a partial conciliation agreement with Braniff, under which Braniff agreed to allow plaintiff to enter its flight attendant school. After completing Braniff's training program, Quigley became a Braniff flight attendant.

### I. The Proposed Expanded Class

On October 12, 1978, plaintiff moved to represent the following class:

All black applicants for flight attendant positions with the defendant and all black individuals who would, but for defendant's discriminatory hiring and recruiting practices have applied and been hired by defendant from 4/26/73 until the present.

On February 21, 1979, plaintiff amended her motion and moved this court to certify this expanded class:

All black applicants for flight attendant, customer service agent or reservationist, or any other position within the EEO designated reporting category "sales" with the defendant and all black individuals who would, but for defendant's discriminatory hiring and recruiting practices, have applied for and been hired by defendant for such positions from April 26, 1973, until the present.

Plaintiff is barred from representing the claims of black applicants for reservationist, customer service agent, and cargo sales agent positions. Because of the Consent Order and Decree entered in *High v. Braniff Airways, Inc.*, C.A. No. SA–73–CA–208 (W.D.Tex., November 23, 1976), those claims against Braniff are *res judicata* and cannot be relitigated.

On August 27, 1973, Frederick H. High and nine other named plaintiffs brought a Title VII class action against Braniff Airways, the International Association of Machinists and Aerospace Workers ("IAM"), and the International Brotherhood of Teamsters ("Teamsters"). The Teamsters are the collective bargaining agent for Braniff's reservationists, customer service agents, and cargo sales agents. The EEOC intervened as a party plaintiff. The court certified the class in this across-the-board suit as follows:

Black and Spanish-surnamed persons who have been rejected for employment by [Braniff] and all Black employees who have been employed by [Braniff] in positions within the scope of the IAM and [Teamsters] collective bargaining agreements throughout the United States . . . . .

The black applicants for reservationist, customer service agent, and cargo sales agent positions which plaintiff now proposes to represent in addition to flight attendants were thus members of the certified class in the *High* case. The parties in *High* agreed to a settlement which was incorporated in a proposed Decree. Following a hearing in

open court, the court approved the Decree and entered it as a final judgment.

As a general rule, a final judgment on the merits bars a later action if: 1) the judgment was rendered by a court of competent jurisdiction; 2) the parties, or those in privity with them, are identical in both suits; and 3) the same cause of action is involved in both suits. , *Wasoff v. American Automobile Insurance Co.*, 451 F.2d 767, 769 (5th Cir. 1971); *Seaboard Coast Line Railroad v. Gulf Oil Corp.*, 409 F.2d 879, 881 (5th Cir. 1969). The Supreme Court has held that satisfaction of these criteria renders a judgment an absolute bar to a subsequent action, not only as to every matter which "was actually offered and received to sustain the demand, but also as to every ground of recovery which might have been presented." *Baltimore S. S. Co. v. Phillips*, 274 U.S. 316, 319, 47 S.Ct. 600, 602, 71 L.Ed. 1069 (1927), *quoted in Astron Industrial Associates, Inc. v. Chrysler Motors ·Corp.*, 405 F.2d 958, 960 (5th Cir. 1968).

The *High* decree satisfies each of the three criteria set forth in *Wasoff* and *Seaboard*. There is no question that the United States District Court for the Western District of Texas had jurisdiction over the *High* parties and subject matter. Furthermore, there is sufficient identity of parties. Braniff was the defendant in both cases, and black applicants for reservationist, customer service agent, and cargo sales agent positions were members of both the *High* class and the proposed class in this case. Finally, both suits involve the same cause of action. The Fifth Circuit in *Seaboard* set forth the test for "the same cause of action:" the court must inquire into "whether or not the primary right and duty, and the delict or wrong are the same in each action." Both cases present, *inter alia*, the question of whether Braniff discriminates on the basis of race in the hiring of reservationists, customer service agents, and cargo sales agents. Thus they involve the ·same "primary right" and "delict or wrong."

The fact that *High* and this case are class actions does not necessarily change the *res judicata* effect of the previous judg-

ment. A final judgment in ˙a class action binds all class members even though they may not be named parties in the suit. *See Sam Fox Publishing· Co. v. United States*, 366 U.S. 683, 81 S.Ct. 1309, 6 L.Ed.2d 604 (1961). Furthermore, the rules of *res judicata* and collateral estoppel apply as well to consent decrees entered as to final judgments. *Id.; United States v. Allegheny-Ludlum Industries, Inc.*, 517 F.2d 826, 850–51 (5th Cir. 1975), *cert. denied*, 425 U.S. 944, 96 S.Ct. 1684, 48 L.Ed.2d 187 (1976).

This rule, however, is not absolute. A class member is not barred if he was inadequately represented. Further, in the case of a consent decree, a class member is not barred if the notice he received of the proposed settlement was insufficient. Plaintiff contends that in the *High* case, the black applicants for positions as reservationist, customer service agent, and cargo sales agent did not receive either adequate representation or sufficient notice.

Plaintiff argues that an examination of the consent decree itself, which awards unsuccessful applicants no relief, demonstrates that the black applicant members of the *High* class received inadequate representation. They did not receive back pay; nor did they receive affirmative hiring relief other than that available to the general public. Plaintiff fails to recognize, however, that the decree does set forth "Employee Selection Criteria," "Qualification Requirements," and "Hiring Procedures." It also establishes specific minority employment "goals and timetables" for various jobs including customer service agent and reservationist. Thus the decree does provide relief for previous applicants should they choose to reapply.

Furthermore, adequacy of representation does not revolve around whether the various class members receive the relief they seek. If class members could sit back and see whether the court awards them a desirable judgment and then attack the judgment collaterally if unsatisfied with the award they receive, the purpose of *res judicata* would be undermined and class action

defendants would be placed in a precarious and unfair position. Due process entitles class members to notice and to adequate representation. It does not entitle them to continue to challenge the defendant's conduct until they are ultimately successful.

Plaintiff further contends that the notice of the settlement which the black applicants received in *High* was inadequate and that it thus prevents the *High* decree from having a *res judicata* effect on unsuccessful applicants. It is well established that notice must be such that nonparty class members have the opportunity to protect their interests:

> The reason for [the notice requirement] is obvious. Because the rights of many persons are at stake who are parties to the action only through their representative, a settlement negotiated between the named parties may not give due regard to the interests of those unnamed.

*Norman v. McKee*, 431 F.2d 769, 774 (9th Cir. 1970), *cert. denied sub nom. ISI Corp. v. Myers*, 401 U.S. 912, 91 S.Ct. 879, 27 L.Ed.2d 811 (1971).

Rule 23(e), however, which provides that notice be given "in such a manner as the court directs," leaves the trial court with virtually complete discretion as to the manner and method of notice. C. Wright & A. Miller, Federal Practice and Procedure § 1797, at 237. This is in keeping with the rest of Rule 23(e), which leaves the approval of settlements and the protection of class members to the discretion of the trial court. *Miller v. Republic National Life Insurance Co.*, 559 F.2d 426 (5th Cir. 1977); *Norman v. McKee, supra.* Appellate courts thus intervene "only upon a clear showing that the trial court was guilty of an abuse of discretion." *United Founders Life Insurance Co. v. Consumers National Life Insurance Co.*, 447 F.2d 647 (7th Cir. 1971); *see Miller v. Republic National Life Insurance Co., supra.* Courts in reviewing a collateral attack on a class action decree should likewise act with deference to the trial court's discretion.

■ The question that this court must answer is whether the fact that unsuccessful black applicants were notified only by publication while employees received notice by mail and publication deprived the applicants of due process and was an abuse of the trial court's discretion. Courts in their discretion have fashioned differing methods of giving notice depending upon the nature and facts of the various cases. Many courts have not required notice by mail but have instead permitted notice by publication or posting. *See, e. g., Cranston v. Hardin*, 504 F.2d 566 (2d Cir. 1974); *Oburn v. Shapp*, 393 F.Supp. 561 (E.D.Pa.), *aff'd on other grounds*, 521 F.2d 142 (3rd Cir. 1975). Plaintiff claims under the facts of *High* that because Braniff keeps applicant records for several years, the unsuccessful applicants could have been and should have been contacted by mail. There is no indication, however, that Braniff application forms identify the race of the applicants; indeed, as discussed in the following section, the fact that application forms for flight attendants do not state the race of the applicant suggests that applicant forms for reservationist, customer service agent, and cargo sales agent positions also omit that information. The fact that the court in *High* found that notice to applicants by publication was "the best notice practicable under the circumstances" also indicates that the identity of unsuccessful black applicants could not be determined. The plaintiff has introduced no evidence to the contrary. The court ordered that notice be published in "a newspaper of general circulation in each of the localities where Braniff operates a station." This court is unwilling to say that, given the facts and circumstances of the *High* case, the published notice was inadequate under Rule 23(e). Plaintiff's amended motion for class certification is therefore DENIED.

## II. The Proposed Flight Attendant Class

■ The next question facing the court is whether to certify the proposed class of unsuccessful and deterred black applicants for flight attendant positions from April 26, 1973, to the present. Defendant's strategy in response to this issue has been to frag-

ment the flight attendant hiring process and thus fragment the putative class. Specifically, defendant claims that the hiring process is broken down into a number of phases—the initial application phase, the interview phase, the testing phase, and the training phase—and that there is therefore no such thing as an overall applicant class. Rather, there is a putative "interview" class, a putative "testing" class, and so forth, and applicants rejected at the interview phase or the testing phase may be considered a part of those respective classes, but of no other. This argument runs through defendant's challenges to standing, commonality, typicality, and adequacy. For example, defendant contends that a person disqualified at the interview stage lacks standing to represent those who were disqualified before that stage; an applicant disqualified by testing does not raise questions in common with those disqualified by the education requirement, and so on.

This obfuscating approach cannot defeat class certification. As discussed in greater depth below, plaintiff's challenge is to defendant's overall hiring practices, and not to individual stages of the hiring process.

### A. Standing.

Braniff argues that Article III's standing requirements prevent Quigley from representing all members of the proposed class. Defendant contends that the plaintiff, who passed the pre-interview test, met the educational requirement, and ultimately completed Braniff's training program, lacks standing to represent those who were disqualified at those various stages. Braniff similarly argues that because Quigley was selected for an interview, she does not have standing to represent those who were not interviewed. Braniff thus contends that a class representative only has standing to raise those class claims that she would be able to assert individually; that is, that the named plaintiff and the class must assert precisely the same claims.

This court has already addressed the issue of standing in Title VII class actions in *Vuyanich v. Republic National Bank*, 82 F.R.D. 420 (N.D.Tex.1979). In that case, the court held that a class representative has standing if she alleges that she as an individual has suffered concrete injury. If she passes this threshold constitutional test, then the next question of whether she may represent the putative class members is not in the first instance one of standing. Instead, the court must first scrutinize the relationship between the representative and the class members to determine whether it satisfies the requirements of Rule 23.

Rule 23, however, must not be read in a vacuum. Rather, it must be viewed against the nature and purpose of the substantive law underlying the plaintiff's claim. In an employment discrimination case, the court must apply Rule 23 in such a way as to fulfill Congress' purpose in enacting Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–5.

Congress intended Title VII to be a broad, remedial measure aimed at eliminating the widespread discriminatory employment conditions that have a destructive impact not only on those "forced into a condition of marginal existence" but also on the nation as a whole deprived of the talents of the victims of discrimination. [1964] U.S. Code Cong. & Admin.News, pp. 2355, 2514; see id. at 2525, 2516; H.R.Rep.No.914; id. at 2393; S.Rep.No.872; id. at 2377. This court must read Rule 23's standards with sufficient breadth to carry out Congress' lofty goals.[1]

As this court has already held, the law does not mandate a holding that a plaintiff complaining of one employment practice cannot represent an employee complaining of a different employment practice, at least in an across-the-board suit; indeed, the purposes of Title VII counsel in favor of across-

1. *Payne v. Travenol Laboratories, Inc.*, 565 F.2d 895 (5th Cir.), *cert. denied*, 439 U.S. 835, 99 S.Ct. 118, 58 L.Ed.2d 131 (1978), and *East Texas Motor Freight Systems v. Rodriguez*, 431 U.S. 395, 97 S.Ct. 1891, 52 L.Ed.2d 453 (1977), cases on which defendant heavily relies, do not preclude this court's interpretation of the standing requirement. *See Vuyanich v. Republic National Bank*, 82 F.R.D. 420, 427–28 (N.D. Tex.1979).

the-board representation. Recent Fifth Circuit cases have endorsed such suits. *See Satterwhite v. City of Greenville,* 578 F.2d 987 (5th Cir. 1978), *petition for cert. docketed,* 48 U.S.L.W. 3088 (1979); *Payne v. Travenol Laboratories, Inc., supra* n.1, at 900. The court in *Satterwhite* explicitly stated that "[i]t is not necessary that the representative suffer discrimination in the same way as other class members, but it is necessary that she suffer from discrimination in some respect." 578 F.2d at 994 n.8. While this is not an across-the-board suit in the sense that all employment practices are attacked, plaintiff does attack all aspects of defendant's layered hiring process. The nexus between Quigley and her class is direct because she claims not to have been hired for the same reason—race.

### B. *Rule 23.*

It is well established that in order for a Rule 23(b)(2) suit to be maintained as a class action, each of the four requirements set forth in Rule 23(a) as well as the requirement of Rule 23(b)(2) must be satisfied. If any of these tests is not met, the court must refuse to certify the class. *See Huff v. N. D. Cass Co.,* 485 F.2d 710, 712 (5th Cir. 1973); *Eisen v. Carlisle & Jacquelin,* 391 F.2d 555, 556 (2d Cir. 1968).

#### 1. *Rule 23(b)(2) and Commonality.*

Rule 23(b)(2) requires a showing for class certification that "the party opposing the class acted or refused to act on grounds generally applicable to the class." The term "generally applicable" has been interpreted to mean "that the party opposing the class does not have to act directly against each member of the class. As long as his actions would affect all persons similarly situated, his acts apply generally to the whole class." C. Wright & A. Miller, *Federal Practice & Procedure* § 1775, at 19, *quoting Rule 23, Categories in Subsection (b), in the Class Action—A Symposium,* 10 B.C.Ind. & Com.L.Rev. 539, 542 (1969). Rule 23(b)(2) is closely linked to the 23(a)(2) requirement that the plaintiff show the existence of a class raising "common questions of law or fact."

It should be remembered that at this stage of the proceeding the issues are whether common questions exist and whether the defendant allegedly acted or failed to act in a manner generally applicable to the class—not whether the defendant is actually guilty of discrimination. It is true that the plaintiff, to carry her burden, must do more than make conclusory allegations, but on the other hand, she need not make out a prima facie case of liability. It is clear that the plaintiff must make some showing from which the court may draw an inference of discrimination, although the courts have yet to articulate precisely where between these two extremes the plaintiff must place her proof.

The parties agree that the most appropriate method of determining whether a common question exists as to Braniff's refusal to hire black applicants would be to compare the percentage of black applicants to the percentage of actual black hires. Even assuming this were the most appropriate method, however, such a comparison cannot be made because there is no evidence reflecting the racial breakdown of applicants. Braniff's initial application forms simply do not identify applicants by race.

Quigley contends that in the absence of applicant figures, the most appropriate comparison is of actual black hires to national black availability. The Supreme Court in several recent opinions has addressed the question of whether general work force availability figures can be a proper benchmark. It has found that if the questioned job requires no specialized skills, but rather a skill that many possess or that is easily acquired, then comparisons to the general population are proper. In *Teamsters,* the court found that the comparison between the percentage of blacks on the employer's work force and the percentage in the general area-wide population was highly probative, because the skill there involved—the ability to drive a truck—was widely shared. *International Brotherhood of Teamsters v. United States,* 431 U.S. 324, 337–38, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977).

*See Hazelwood School District v. United States,* 433 U.S. 299, 308 n.13, 97 S.Ct. 2736, 2742 n.13, 53 L.Ed.2d 768 (1977). In *Hazelwood,* as here, there was no clear evidence of appropriate applicant-flow statistics.[2] The Court pointed out that "[w]hen special qualifications are required to fill particular jobs, comparisons to the general population (rather than to a smaller group of individuals who possess the necessary qualifications) may have little probative value." *Id.* The Court found that in that suit, in which the plaintiff alleged that the defendant discriminated against Negro applicants for teaching positions, the government's comparative statistics had been properly limited to public school teachers. *Id.* In *New York City Transit Authority v. Beazer,* 440 U.S. 568, 99 S.Ct. 1355, 59 L.Ed.2d 587 (1979), the Court noted:

> Although "a statistical showing of disproportionate impact [need not] always be based on an analysis of the characteristics of actual applicants," *Dothard v. Rawlinson,* 433 U.S. 321, 330, 97 S.Ct. 2720, 53 L.Ed.2d 786, "evidence showing that the figures for the general population might not accurately reflect the pool of qualified job applicants" undermines the significance of such figures. *Teamsters v. United States, supra,* 431 U.S. at 340 n.20, 97 S.Ct. 1843.

440 U.S. at 586 n.29, 99 S.Ct. at 1366 n.29.

The plaintiff in this case contends that the job of flight attendant requires no special skills, that any skill or education requirement that the defendant may impose is not job related, and that national availability figures are therefore proper. The defendant, rather than demonstrating that the position of flight attendant does require special skills, argues that the court should not compare actual hires to the general black population but instead should compare black hires to blacks interviewed. The interview is the second step in the Braniff flight attendant application process. First, an applicant fills out an application form.[3] These written applications are then screened to see whether the applicant meets certain minimal qualifications. Those satisfying the basic requirements are interviewed. Certain of those interviewed are selected for the Braniff flight attendant training school. Graduates of the school become flight attendants. The use of black interviewees as the relevant labor market is inappropriate when the selection of interviewees from applicants is not random or is guided by standards that have a disproportionate and illegal impact on blacks. In this case there is no dispute that the selection of interviewees is premised on their satisfying certain minimal qualifications. Plaintiff explicitly challenges two of those qualifications—education and testing. Quigley contends that at least until 1976, Braniff had a college degree preference and high school degree requirement, and that these education requirements had an adverse impact on blacks and were not job related. Quigley also argues the pre-interview tests were not validated and had an adverse and illegal impact on blacks. Because defendant has not offered proof that flight attendants must possess specialized skills not shown by the general population and has not demonstrated that the group of interviewees is selected according to standards that do not have a disproportionate and illegal impact on blacks,[4] the court finds that at least for present purposes general work force census figures are appropri-

---

**2.** The Court noted that were competent proof of such data to be adduced on remand, "it would, of course, be very relevant." *Id.*

**3.** Although some applicants are walk-ins and are interviewed on the spot, most send in their written applications.

**4.** This is not to say that the defendant has the burden of proof in a class certification hearing. The burden is clearly the plaintiff's. Here, however, the plaintiff had met her initial burden of production by introducing evidence that the general population was the relevant market. The burden of production then shifted to Braniff, who could either have demonstrated that general population availability figures were not suitable, or that another smaller group more accurately approximated the group of actual applicants. The defendant having done neither, the plaintiff has succeeded in meeting her burden of proof.

ate. Because Braniff hires nationally, the geographic area for these general work force figures is national.

Plaintiff, using national availability figures as a source of comparison, introduced statistical evidence to support her position that Braniff acted in a manner generally applicable to the proposed class and that the proposed class members raise common questions. She compared the percentage of blacks actually hired as flight attendants from 1970 to 1977 to a national availability figure of 10.3%.[5] Plaintiff's calculations revealed statistically significant[6] disparities between the actual and expected number of black hires from 1973 through 1975. The results were as follows:

|  | (N) Total Hires | (X) Number of Blacks Hired | % Black | Z[7] |
|---|---|---|---|---|
| 1973 | 306 | 8 | 2.6% | −4.42 |
| 1974 | 279 | 12 | 4.3% | −3.30 |
| 1975 | 101 | 2 | 2% | −2.75 |
| 1976 | 221 | 42 | 19% | +4.26 |
| 1977 | 444 | 70 | 15.8% | +3.79 |

The above results for 1973 through 1975 are suspect, and support the inference that in those years race played a part in the hiring of flight attendants. The results for 1976 and 1977, however, do not support plaintiff's contention that the class should also include black applicants who were denied employment in those years.

Defendant argues that closer analysis of plaintiff's statistically significant results reveals that any demonstrated racial disparities are in fact due to sex discrimination rather than race discrimination. While such an explanation might serve to rebut any inference of purposeful racially disparate treatment, it would still be necessary for defendant to justify such sex discrimination, given its racially disparate impact, as constituting a reasonable measure of job performance. As stated in *Griggs v. Duke*

5. Defendant claims, and the court has found, that the relevant geographical market is national because defendant recruits nationally. The 10.3% figure, acknowledged by the EEOC as reflecting the percentage of blacks in the national civilian labor force, is taken from *Employment & Earnings—January, 1977,* Vol. 21, No. 1, Bureau of Labor Statistics, U. S. Department of Labor. Plaintiff has argued that although Braniff recruits nationally, it focuses on urban areas, so the percentage used should be based on an average of figures from various urban areas. Plaintiff has offered inadequate evidence about this alleged focus. Moreover, the court observes without deciding that even if there were such a focus, the percentage figure would have to be a weighted average of all the areas being recruited, not just certain urban areas, and that that weighted average might have to be adjusted for the fact that some people in rural areas are willing to go to a city for short periods of time to apply for an especially attractive job.

6. With a test of statistical significance we learn the probability that the observed value could have happened by chance, *i. e.,* the probability that in a random sample of an appropriate test population the variable would exhibit a value as strong as that observed. A test of statistical significance is thus itself based on the results of a hypothetical experiment. We suppose that an infinite number of samples of the same size are drawn from the test population. The probability of the observed value occurring by chance is equal to the proportion of the samples in which the value is at least as extreme as the observed value. It has become a convention in social science to accept as statistically significant values which have a probability of occurring by chance 5% of the time or less. *See generally* N. Nie, C. Hull, J. Jenkins, K. Steinbrenner, & D. Bent, *Statistical Package for the Social Sciences* 222 (2d ed. 1975).

7. Z reflects the number of standard deviations between the actual or observed number of black hires and the expected number. If the standard deviation is $SD = \sqrt{(.103)(.897)(N)}$, and the expected number of hires is $E = N \times .103$, then $Z = (X-E)/SD$.

*Power Co.,* 401 U.S. 424, 432, 91 S.Ct. 849, 854, 28 L.Ed.2d 158 (1971), "good intent or absence of discriminatory intent does not redeem employment procedures or testing mechanisms that operate as 'built-in headwinds' for minority groups and are unrelated to measuring job capability." Even if sex discrimination in employment were not itself illegal, it is unlikely at best that a showing of job-relatedness could be made with respect to any sex requirement or preference. Hence alleged sex discrimination can no more stand in the way of class certification than can defendant's challenged education and testing requirements.

In addition to challenging defendant's education and preinterview testing requirements,[8] plaintiff suggests that Braniff's subjective hiring criteria and selection process, run by a predominately white group, is like that in *Rowe v. General Motors,* 457 F.2d 348 (5th Cir. 1972). In that case, the court recognized that employment systems which "depend almost entirely upon . . . subjective evaluation and favorable recommendation . . . are a ready mechanism for discrimination against Blacks much of which can be covertly concealed." 457 F.2d at 359. While this court has noted that "subjective evaluations still have an important role in decision-making processes," *Cooper v. University of Texas at Dallas,* 482 F.Supp. 187, 195 (N.D.Tex.1979), it remains true that "such subjectivity must withstand the test of nondiscriminatory impact." *Id.* The effect of such subjectivity represents another common issue to be resolved at trial.

Defendant argues that plaintiff must do more at the class certification stage than indicate the existence of such allegedly illegal policies and practices as education requirements, unvalidated testing, and subjective hiring. Braniff contends Quigley must introduce evidence establishing that the testing and education requirements are in fact not job-related and that each policy had had a statistically demonstrable disparate impact. Defendant misconceives plaintiff's burden at this stage. Plaintiff need only establish that common questions exist and that the defendant acted in a manner generally applicable to the class as a whole. Plaintiff introduced statistics that support the inference that defendant discriminates against blacks in hiring; to support these statistics, she introduced evidence that certain policies and practices exist that may have an adverse and illegal impact on blacks. For class certification, this is sufficient. She need not prove that these policies did in fact adversely affect blacks. Defendant's controverting statistical evidence, indicating that the education and testing requirements did not discriminate against blacks, only demonstrates that its position of denial may not be insubstantial. Plaintiff's and defendant's evidence thus points to the conclusion that common questions do exist and that at the liability phase of the proceeding, the court will have the duty of resolving certain contested issues of law and fact.

Defendant also contends that testing and education requirements were abandoned before 1975, and thus that applicants in 1973 and 1974 do not share common questions with 1975 applicants. Again, defendant is trying to fragment the hiring process. The common question is whether defendant discriminated in hiring black flight attendants; plaintiff has already established the existence of this common question through her statistics showing significant disparities from 1973 through 1975. The fact that testing and educational requirements may have been abandoned during the class period does not detract from the existence of a common question.

### 2. *Typicality.*

Rule 23(a)(3) focuses the court's attention on the nature of the representative's claims. It requires a determination of whether, given the fact that the representative raises

---

8. Plaintiff also challenges Braniff's testing of flight attendant trainees in 1973 and 1974. Quigley argues that these unvalidated tests, like those given to applicants before their interviews, were not job-related and had an adverse and illegal impact on blacks.

some question of law or fact that is common to the class, the remaining issues and possible defenses are also typical.

Defendant attacks the typicality of plaintiff's claims on numerous grounds. First, Braniff claims that because there are many phases of the hiring process and because Quigley passed through several of them successfully, her claim cannot be typical. Thus Braniff argues that the typicality requirement allows a plaintiff in this case to represent only those employees who were disqualified by the same hiring practice as she was.[9] In a related vein, Braniff contends that because the training program is totally distinct from the process by which applicants are selected for training, Quigley's claims that she was discriminated against before she entered training is not typical.

The Fifth Circuit's endorsement of across-the-board suits mandates that this court reject Braniff's arguments. As that court stated in *Payne v. Travenol Laboratories, Inc., supra* :

> Plaintiffs' action is an "across the board" attack on unequal employment practices alleged to have been committed by Travenol pursuant to a policy of racial discrimination. As parties who have allegedly been aggrieved by some of those discriminatory practices, plaintiffs have demonstrated a sufficient nexus to enable them to represent other class members suffering from different practices motivated by the same policies.

565 F.2d at 900. The core principles for measuring the relationship between the class representation and class which counsel in favor of typicality in an across-the-board context here counsel in favor of a finding of typicality.

While the typicality requirement does not preclude a class that includes pre-trainee applicants as well as trainees, the court may find in the future that subclassing under Rule 23(c)(4), according to the practices of which the members complain, will facilitate the proceeding. If it appears that such subclassing will expedite the presentation of evidence, the court, in accordance with its continuing duty to monitor the class, will create a subclass of trainees. It does not appear at this time, however, that the evidence is so massive and that the trial will be so cumbersome as to require such subclassing.

▉ Braniff further argues that Quigley's claim, if true, is unique. It contends that Quigley, who alleges that Braniff's stated reasons for denying her employment in September, 1973—her weight and her unwillingness to relocate—were in fact mere pretexts, can only represent those who claim disparate treatment in the application of weight standards and relocation requirements. Quigley's claim, like that of all class members, is of race discrimination. The fact that Braniff may have used her weight as an excuse not to hire her when the real reason was her race does not make Quigley's claim any less a typical claim of race discrimination. Finally, it should be noted that even if a class representative of a certified class ultimately loses her individual claim on the merits, the class claims may still stand. *East Texas Motor Freight Systems, Inc. v. Rodriguez,* 431 U.S. 395, 406 n.12, 97 S.Ct. 1891, 52 L.Ed.2d 453 (1977).

Braniff additionally claims that because Quigley entered into a partial settlement agreement with the defendant, her claims are not typical. The settlement contains no specific provisions touching on the relief that Quigley here seeks. In fact, in the agreement, Quigley specifically reserved her rights to litigate her claims. Thus her claims must be considered typical of any other rejected applicant despite the agreement.

### 3. *Adequacy.*

▉ Adequacy of representation is crucial to assure that the absent class members are not deprived of due process, and that

---

9. Braniff actually phrases the arguments in terms of commonality. The attack, however, in reality focuses on the typicality requirement.

the final judgment is binding. In assessing a representative's adequacy, a court should focus in the first instance on the interrelated questions of attorney competence and any conflicts with the interests of the class members. At the outset, the court notes that counsel for the plaintiff and the proposed class is diligent, thorough, and skilled in Title VII litigation in both individual and class contexts. A lack of congruence among the interests of the class representative and the class members may, however, render the attorney, despite his qualifications, unable to fully and fairly counsel the plaintiff and class members, to each of whom he owes a duty. *Vuyanich v. Republic National Bank, supra; Harris v. Pan American World Airways, Inc.,* 74 F.R.D. 24, 43 (N.D.Cal.1977). *See Mandujano v. Basic Vegetable Products, Inc.,* 541 F.2d 832 (9th Cir. 1976). A plaintiff whose interests conflict with those of certain class members limits her attorney's ability to counsel the class. She is therefore an inadequate representative.

Braniff contends that Quigley has a conflict with the class because, although she is a flight attendant, she has requested retroactive and prospective seniority for the proposed class. Defendant argues that her interest and those of other flight attendants would be dramatically affected by any award of retroactive seniority. Thus Braniff claims that it is directly contrary to Quigley's interest to represent diligently the class in its pursuit of a seniority award. First, it is clearly in Quigley's interest to have this court award seniority. It was not until 1976, three years after her initial rejection, that she became a flight attendant. Her settlement with Braniff did not award her seniority. Thus, if the court were to award retroactive seniority, Quigley could stand to gain an additional three years of seniority.

Furthermore, if a potential conflict over seniority does exist between plaintiff and certain class members, it is a conflict that will arise only after liability has been established and the remedy phase of the trial commences. At that time, if the court deems it necessary, it will divide the class into subclasses for the purpose of granting relief and allow class members to intervene to represent the interests of any subclass with which the plaintiff's interests conflict. *See Vuyanich v. Republic National Bank, supra.*

### 4. Impracticability of Joinder.

Rule 23(a)(1) requires that the proposed class be so numerous that joinder is impracticable. Any Braniff challenge to the numbers of putative class members is premised on this court's rejection of plaintiff's relevant labor market and its adoption of Braniff's fragmented view of the hiring process. The court having accepted plaintiff's proposed market and her unified approach to hiring, it finds that the class is sufficiently numerous to satisfy Rule 23.

### III. The Proposed Deterred Applicant Class

■■■ Plaintiff's proposed class includes blacks who would have applied, but were deterred from doing so by Braniff's discriminatory hiring and recruiting practices. This court is unwilling to certify such an amorphous and vague class. A class composed of nonapplicants who claim a subjective deterrence is so indefinite that a decision concerning liability to such a class would be subject to collateral attack from absent class members. *See Koen v. Long,* 302 F.Supp. 1383, 1388–89 (E.D.Mo.1969), *aff'd,* 428 F.2d 876 (8th Cir. 1970), *cert. denied,* 401 U.S. 923, 91 S.Ct. 877, 27 L.Ed.2d 827 (1971). The identification of the members of such a class would prove an "impossible task." *See International Brotherhood of Teamsters v. United States, supra,* 431 U.S. at 368–69 n.52, 97 S.Ct. 1843, 52 L.Ed. 396. Back pay awards would be grossly speculative. Finally, the relief awarded to such a class would be duplicative of recovery already sought; the class of rejected applicants may seek any injunctive or declaratory relief that deterred applicants might seek.

### IV. Conclusion

The court certifies the following class: All unsuccessful black applicants for flight

attendant positions with the defendant from April 26, 1973, until December 31, 1975.